Opinion for the Court filed by Senior Circuit Judge RANDOLPH.
Concurring opinion filed by Circuit Judge HENDERSON, with whom Circuit Judge BROWN joins.
RANDOLPH, Senior Circuit Judge:
The National Labor Relations Board declared in a rule that employers subject to its jurisdiction would be guilty of an unfair labor practice if they did not post on their properties and on their websites a “Notification of Employee Rights under the National Labor Relations Act.” 76 Fed.Reg. 54,006 (Aug. 30, 2011). The rule applies to “nearly 6 million” employers, “the great majority” of which are small businesses. Id. at 54,042-43. Trade associations and other organizations representing employers across the country filed complaints in the district court, claiming that the Board’s rule violated the National Labor Relations Act and the First Amendment to the Constitution.
The Board’s action departs from its historic practice. From its inception in 1935, the Board has exhibited a “negative attitude” toward setting down principles in rulemaking, rather than adjudication. Bell Aerospace Co. v. NLRB, 475 F.2d 485, 496 (2d Cir.1973) (Friendly, J.), aff'd in part, rev’d in part, 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); see also R. Alexander Acosta, Rebuilding the Board: An Argument for Structural Change, Over Policy Prescriptions, at the NLRB, 5 FIU L. Rev. 347, 351 (2010); Jeffrey S. Lubbers, The Potential of Rulemaking by the NLRB, 5 FIU L. Rev. 411 (2010). Despite its “broad” rulemaking authority under § 6 of the National Labor Relations Act, Am. Hosp. Ass’n v. NLRB, 499 U.S. 606, 613, 111 S.Ct. 1539, 113 L.Ed.2d 675 (1991), the Board had “used rulemaking as a means of announcing—or considering— its policies on only a few occasions” until 1989, the year in which it issued the substantive regulation upheld in American Hospital, RobeRt A. GorMAN & Matthew W. FinKIN, Basio Text on Labor Law: Unionization anb Collective Bargaining 21 (2d ed.2004).
The path leading to the posting rule goes back to 1993 when a law professor petitioned the Board. See 75 Fed.Reg. 80,410, 80,411 (Dec. 22, 2010). Despite prodding from this law professor and, later, several others, the Board declined to act. Then, in 2010, the Board issued a *950 notice of proposed rulemaking. Id. at 80,-410. After receiving more than 7000 comments, the Board published a final rule on August 30, 2011, with Member Hayes dissenting. 76 Fed.Reg. 54,006.
The final rule provides that “[a]ll employers subject to the NLRA must post notices to employees, in conspicuous places, informing them of their NLRA rights, together with Board contact information and information concerning basic enforcement procedures, in the language set forth in the Appendix to Subpart A of this part.” 29 C.F.R. § 104.202(a). In addition, employers who customarily communicate with their employees electronically must publish the Board’s notice on their intranet or internet sites. See id. § 104.202(f). The required poster, which is published as an addendum to this opinion, must be at least 11 inches by 17 inches and in a type size and format the Board prescribes. See id. § 104.202(b). The poster informs employees of their right to form, join, or assist a union; to bargain collectively through representatives of their choosing; to discuss wages, benefits, and other terms and conditions of employment with fellow employees or a union; to take action to improve working conditions; to strike and picket; or to choose not to engage in any of these activities. See 29 C.F.R. pt. 104, subpt. A, app. The poster also recites more specific employee rights the Board derived from judicial and Board interpretations of the Act. See 76 Fed.Reg. at 54,01s.[1] The poster states, for example, that it is “illegal” for an employer to prohibit employees “from wearing union hats, buttons, t-shirts, and pins in the workplace” or to “[s]py on or videotape peaceful union activities and gatherings or pretend to do so.” 29 C.F.R. pt. 104, subpt. A, app. The poster also states that it is “illegal” for a union to “[tjhreaten or coerce [an employee] in order to gain ... support for the union” or to “[r]efuse to process a grievance because [the employee] ha[s] criticized union officials or ... [is] not a member of the union.” Id.
As an enforcement mechanism, the rule declares that an employer’s failure to post the notice is an unfair labor practice—that is, it “may be found to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed by NLRA Section 7, 29 U.S.C. 157, in violation of NLRA Section 8(a)(1), 29 U.S.C. 158(a)(1).” 29 C.F.R. § 104.210.
Section 7 of the Act provides that employees
shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in [section 8(a)(3) of the Act].
29 U.S.C. § 157. (Under § 8(a)(1) it is an “unfair labor practice” for an employer “to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [section 7 of the Act].” Id. § 158(a)(1).)
The rule contains two additional enforcement devices. The Board may suspend the running of the six-month limitations period for filing any unfair-labor-practice charge under § 10(b), 29 U.S.C. § 160(b), *951 “unless the employee has received actual or constructive notice that the conduct complained of is unlawful.” 29 C.F.R. § 104.214(a). And the Board may consider an employer’s “knowing and willful refusal to comply with the requirement to post the employee notice as evidence of unlawful motive in a case in which motive is an issue.” Id. § 104.214(b).
The Board invoked § 6 of the Act as authority for the rule. That section provides that the “Board shall have authority from time to time to make, amend, and rescind, in the manner prescribed by [the Administrative Procedure Act], such rules and regulations as may be necessary to carry out the provisions” of the Act. 29 U.S.C. § 156. The Board thought the rule was necessary because employees were not aware of their rights under the Act. See 76 Fed.Reg. at 54,006. The Board offered three reasons why: unions now represent only a small percentage of the private workforce, by the latest count just 7.3 percent;[2] immigrants make up “an increasing proportion of the nation’s work force” and “are unlikely to be familiar with their workplace rights”; and many high-school students about to enter the workforce are not familiar with labor laws. 75 Fed.Reg. at 80,411.
“Enforcement of the NLRA,” the Board stated, “depend[s] on the existence of outside actors who are not only aware of their rights but also know where they may seek to vindicate them within appropriate time-frames.” 76 Fed.Reg. at 54,010. By this, the Board meant that unfair-labor-practice cases must begin with a charge filed by an employee or a union or an employer. “The charge triggers an inquiry that may (or may not) result in the issuance of a complaint by the Board.... However, neither the Board nor its agents are authorized to institute charges sua sponte.” GormaN & Finkin, Basic Text on Labor Law, supra, at 10. Board orders finding an unfair labor practice after proceedings on a complaint are “not self-executing.” Id. at 14. Rather, the Board must petition a court of appeals for enforcement—that is, for a court order requiring the offending party to comply with the Board’s order. See id.
Member Hayes, dissenting, disputed both the Board’s authority under § 6 and the evidentiary support the Board majority relied upon in concluding the posting rule was needed. See 76 Fed.Reg. at 54,-037-42.
On cross-motions for summary judgment, the district court ruled as follows. The court first decided that the Board had the authority, under § 6 of the Act, to promulgate the posting rule. See Nat’l Ass’n of Mfrs. v. NLRB, 846 F.Supp.2d 34, 48 (D.D.C.2012). Citing Mourning v. Family Publications Service, Inc., 411 U.S. 356, 369, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973), and other decisions, the court determined that the rule was reasonably related to the purposes of the Act, and that the plaintiffs’ contrary arguments, based mainly on the Act’s legislative history,-were unpersuasive. See id. at 43-48. But citing § 8(a)(1) and § 8(c), of which more hereafter, the court ruled that the Board had no authority to make a “blanket advance determination that a failure to post will always constitute an unfair labor practice,” although the court did not preclude such a finding in an individual case. Id. at 54-55. The district court also held invalid the section of the rule tolling the § 10(b) limitations period if the employer *952 failed to post the notice. Whether there should be tolling, the court ruled, depended on equitable considerations that had to be determined on a case-by-case basis. See id. at 55-58. As to the part of the rule that permitted an employer’s failure to post to be considered as evidence of an improper motive, the court asserted, first, that plaintiffs had not made a specific argument against this provision, and second, that even if they had done so, the court would uphold it because “the Rule does not make a blanket finding that will govern future individual adjudications or create a presumption of anti-union animus whenever an employer fails to post the provision.” Id. at 63 & n. 26.
Having determined that two of the rule’s provisions were invalid, the court turned to the question whether the entire rule should fall. The court held that the Board would have wanted the posting requirement to stand even if two of three means of enforcing it were invalid. See id. at 61-63.
The case is here on plaintiffs’ appeal and the Board’s cross-appeal.[3]
One month after the district court issued its opinion, the United States District Court for the District of South Carolina held that the Board lacked authority to promulgate the rule. See Chamber of Commerce of the U.S. v. NLRB, 856 F.Supp.2d 778 (D.S.C.2012). The appeal in that case is now pending before the Fourth Circuit.
I
Although the parties have not raised it, one issue needs to be resolved before we turn to the merits of the case. After oral argument in this case, we held that a recess appointment is constitutionally valid only if the appointment is made during an intersession recess of the Senate, to fill a vacancy that arose during that same intersession recess. See Noel Canning v. NLRB, 705 F.3d 490, 506, 512, 514 (D.C.Cir.2013). The Board had four members when the Federal Register published the proposed notice-posting rule on December 22, 2010. Three members, Wilma B. Liebman, Mark G. Pearce, and Brian Hayes, were' confirmed by the Senate. See 156 Cong. Rec. S5281 (daily ed. June 22, 2010) (Pearce and Hayes); 152 Cong. Rec. S8906-07 (daily ed. Aug. 3, 2006) (Liebman).[4] The fourth member, Craig Becker, was appointed by the President on March 27, 2010, during an intrasession recess of the Senate. To the extent that Noel Canning applies—we assume, without deciding, that it does—Becker’s appointment was constitutionally invalid.
The Board can lawfully act with a quorum of three members. See 29 U.S.C. § 153(b); New Process Steel, L.P. v. NLRB, — U.S. -, 130 S.Ct. 2635, 2640, 177 L.Edüd 162 (2010). Chairman Liebman’s term expired on August 27, 2011. Her seat was not immediately filled. That left the Board without a valid quorum by the time the final rule was published in the Federal Register on August 30, 2011. But assuming, again without deciding, that the existence of a valid quorum is a juris *953 dietional issue or that we otherwise may exercise our discretion to raise the issue sua sponte, we see no problem here.
The Federal Register Act requires a regulation (or other document) to be filed with the Office of the Federal Register before it is published in the Federal Register. See 44 U.S.C. § 1503.[5] The date and time of filing is noted on the document, and upon filing, a copy of the document is immediately available for public inspection in the Office of the Federal Register, even though the document will not be published until later. See id.[6] The Federal Register Act further provides that the filing of a document required to be published in the Federal Register constitutes constructive notice to anyone subject to or affected by it. See 44 U.S.C. § 1507.
In light of these provisions, we believe the date of filing is the relevant time for determining whether the Board had a valid quorum. Chairman Liebman signed the final rule on August 22, 2011, and the rule was filed with the Office of the Federal Register on August 25, 2011, before her term expired, when the Board still had a constitutionally appointed quorum. Once the rule was filed with the Office of the Federal Register, the Board had taken all the steps necessary to issue the rule— there was nothing left for the Board to do. All that remained was for the rule to be published in the Federal Register, but that was in the hands of the Office of the Federal Register.
The Office of Legal Counsel of the Department of Justice has also taken the view that, for purposes of determining whether an agency has complied with a statutory deadline for issuing regulations, promulgation takes place when the final regulations are filed with the Office of the Federal Register, regardless of when the regulations are published in the Federal Register. See Federal Register Act— Date of “Promulgation” of Law Enforcement Assistance Admin. Regs., 1 Op. O.L.C. 12 (1977).
We employed similar reasoning in Braniff Airways, Inc. v. Civil Aeronautics Board, when we concluded that an order of the Civil Aeronautics Board was valid even though the chairman resigned and the Board thereby lost a quorum between the time the order was signed and entered and the time it was served on the parties. See 379 F.2d 453, 459 (D.C.Cir.1967). Although the Aeronautics Board had stated that “a ‘proposed decision of the Board does not become effective until an opinion and order ... has been approved, issued, and served,’ ” our view was that “once all members have voted for an award and caused it to be issued the order is not nullified because of incapacity, intervening before the ministerial act of service, of a member needed for a quorum.” Id.
We recognize that in determining the timeliness of petitions for review of agency rules, we have concluded that “promulgation” takes place when a rule is published in the Federal Register. See Horsehead Res. Dev. Co. v. EPA, 130 F.3d 1090 (D.C.Cir.1997); Nat’l Grain & Feed Ass’n v. Occupational Safety & Health Admin., 845 F.2d 345 (D.C.Cir.1988) (per curiam). But the question when a rule is eligible for judicial review is not the same as the question posed in this case—namely, what is the time for testing the validity of the Board’s rule. In National Grain, we distinguished between “issuance” and “pro *954 mulgation” to determine the timeliness of a petition for review of an Occupational Safety and Health Administration standard. The statute provided for review of a standard “issued” under the statute no later than sixty days after the standard was “promulgated.” Nat’l Grain & Feed Ass’n, 845 F.2d at 345 (quoting 29 U.S.C. § 655(f)) (emphasis omitted). The agency’s regulations stated that a standard was issued when it was “officially filed in the Office of the Federal Register.” Id. (quoting 29 C.F.R. § 1911.18(d)). But the agency had not defined the term “promulgate,” and without a regulation equating the date of promulgation with the date of issuance, we declined the agency’s request to treat the terms as synonymous. See id. at 345-46.
We are not constrained by such statutory terms and need not determine when the Board’s rule was “promulgated.”[7] Our judgment is that the time of filing with the Office of the Federal Register is the appropriate time for determining whether the Board had a valid quorum. That the Board may have lost a quorum before its rule was published did not render its rule invalid.
II
The parties devote a large part of their briefs to the question whether § 6 of the Act gave the Board authority to promulgate its posting rule. We will begin our analysis with a different provision—§ 8(c), which seems to us to control much of the case. Section 8(c) states:
The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this [Act], if such expression contains no threat of reprisal or force or promise of benefit.
29 U.S.C. § 158(c).
Before the enactment of § 8(c) in 1947, the Supreme Court had held that employers have free-speech rights under the First Amendment “to engage in noncoercive speech about unionization.” Chamber of Commerce of the U.S. v. Brown, 554 U.S. 60, 67, 128 S.Ct. 2408, 171 L.Ed.2d 264 (2008). Believing that the Board was still “regulating] employer speech too restrictively,” notwithstanding the Supreme Court’s decisions, id., Congress enacted § 8(c) with its passage of the TafUHartley Act (more formally known as the Labor Management Relations Act, 1947), Pub.L. No. 80-101, 61 Stat. 136. Section 8(c) “expressly precludes regulation of speech about unionization ‘so long as the communications do not contain a threat of reprisal or force or promise of benefit.’ ” Chamber of Commerce, 554 U.S. at 68, 128 S.Ct. 2408 (quoting NLRB v. Gissel Packing Co., 395 U.S. 575, 618, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969)) (other internal quotation marks omitted).
*955 “From one vantage,” the Court in Chamber of Commerce explained, “§ 8(c) ‘merely implements the First Amendment,’ in that it responded to particular constitutional rulings of the NLRB.” Id. at 67, 128 S.Ct. 2408 (quoting Gissel Packing, 395 U.S. at 617, 89 S.Ct. 1918). “But,” the Court added, § 8(c)’s “enactment also manifested a ‘congressional intent to encourage free debate on issues dividing labor and management.’ ” Id. (quoting Linn v. Plant Guard Workers, 383 U.S. 53, 62, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966)). And it has been suggested that § 8(c) not only protects the right of free speech under the First Amendment, but also “serves a labor law function of allowing employers to present an alternative view and information that a union would not present.” Healthcare Ass’n of N.Y. State v. Pataki, 471 F.3d 87, 98 (2d Cir.2006).[8]
Although § 8(c) precludes the Board from finding noncoercive employer speech to be an unfair labor practice, or evidence of an unfair labor practice, the Board’s rule does both.[9] Under the rule an employer’s failure to post the required notice constitutes an unfair labor practice. See 29 C.F.R. §§ 104.210, 104.212.[10] And the Board may consider an employer’s “knowing and willful” noncompliance to be “evidence of antiunion animus in cases in which unlawful motive [is] an element of an unfair labor practice.” 76 Fed.Reg. at 54,035-36; see also 29 C.F.R. § 104.214(b).[11] The Board, in other words, will use an employer’s failure to post the notice as evidence of another unfair labor practice.
*956 In the preamble to its rule, and in its argument to this court, the Board responds that it has not violated § 8(c) because the poster is the Board’s speech, not the speech of any employer. After all, the Board says, the words on the poster are the Board’s, and the last line of the poster warns: “This is an official Government Notice and must not be defaced by anyone.” 29 C.F.R. pt. 104, subpt. A, app.[12]
It is obviously correct that the poster contains the Board’s speech. It is also without question that the Board is free to post the same message on its website, as it has done under the heading “Rights We Protect.” See NLRB, http://www.nlrb.gov/ rights-we-proteet (last visited Apr. 25, 2013). We also assume that the Board may deliver its message directly to employees working for businesses over which the Board has jurisdiction. But we doubt whether calling the poster “Board speech” answers the question whether the rule violates § 8(c).
Our doubt stems, in part, from a comparison of § 8(c) with the law established under the First Amendment. We approach the question by considering some firmly established principles of First Amendment free-speech law. The first is that the “dissemination” of messages others have created is entitled to the same level of protection as the “creation” of messages. Sorrell v. IMS Health Inc., — U.S. -, 131 S.Ct. 2653, 2667, 180 L.Ed.2d 544 (2011). This is why there was no First Amendment difference between the free-speech rights of the publisher and the free-speech rights of the creators of the advertisement in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). It is why the First Amendment protects an individual’s disclosure of an illegally intercepted communication even though the individual did not participate in the communication (or in the illegal interception). See Bartnicki v. Vopper, 532 U.S. 514, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001). It is also why those handing out leaflets prepared by others are exercising the First Amendment’s “freedom of speech.” See, e.g., Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938).
That § 8(c) embraces this principle is certain. The language of § 8(c) explicitly covers more than just the “expressing” of the speaker’s views. It covers as well the “dissemination” of “any views, argument, or opinion,” as long as the “written, printed, graphic, or visual” material disseminated is not coercive. 29 U.S.C. § 158(c).
Of course we are not faced with a regulation forbidding employers from disseminating information someone else has created. Instead, the Board’s rule requires employers to disseminate such information, upon pain of being held to have committed an unfair labor practice. But that difference hardly ends the matter. The right to disseminate another’s speech necessarily includes the right to decide not to disseminate it. First Amendment law acknowledges this apparent truth: “all speech inherently involves choices of what to say and what to leave unsaid.” Pac. Gas & Electric Co. v. Pub. Utils. Comm’n, 475 U.S. 1, 11, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (plurality opinion).
Chief Justice Roberts, writing for a unanimous Court, put it this way in Rumsfeld v. Forum for Academic & Institutional Rights, Inc.: “Some of [the] Court’s leading First Amendment precedents have established the principle that freedom of speech prohibits the government from telling people what they must say.” 547 U.S. *957 47, 61, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006). As examples, the Chief Justice cited West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), and Wooley v. Maynard, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977).
In Barnette the Court held that “[t]o sustain the compulsory flag salute” and pledge of allegiance in public schools would be to conclude “that a Bill of Rights which guards the individual’s right to speak his own mind, left it open to public authorities to compel him to utter what is not in his mind.” 319 U.S. at 634, 63 S.Ct. 1178.
Wooley held much the same: the First Amendment freedom of speech “includes both the right to speak freely and the right to refrain from speaking at all.” 430 U.S. at 714, 97 S.Ct. 1428. New Hampshire therefore could not coerce its citizens to display the State motto “Live Free or Die” on their automobile license plates, although presumably citizens could display it voluntarily. As the Supreme Court put it in United States v. United Foods, Inc.: “Just as the First Amendment may prevent government from prohibiting speech, the Amendment may prevent the government from compelling individuals to express certain views.... ” 533 U.S. 405, 410, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001); see also Johanns v. Livestock Mktg. Ass’n, 544 U.S. 550, 568, 125 S.Ct. 2055, 161 L.Ed.2d 896 (2005) (Thomas, J., concurring); R.J. Reynolds Tobacco Co. v. Food & Drug Admin., 696 F.3d 1205, 1211 (D.C.Cir.2012).
We do not think these, and other such cases, may be distinguished from this one on the Board’s terms. In Barnette and in Wooley, as in this case, the government selected the message and ordered its citizens to convey that message. The Supreme Court’s opinions do not suggest that because the messages were, to that extent, “government speech,” the First Amendment did not apply. And we do not think it matters that the Board has regulatory authority over the six million employers subject to its rule. In Barnette and Wooley, the state and local governments had regulatory authority over those (public school children and automobile drivers) it ordered to spread the message it selected. See also United Foods, 533 U.S. at 410, 121 S.Ct. 2334; R.J. Reynolds, 696 F.3d at 1211.
The Board—in its brief, but not in the rulemaking—argues that this case' is significantly different in light of the content of the poster. The poster, the Board’s acting general counsel tells us, merely recites the employee rights set forth in the National Labor Relations Act (and in court and Board interpretations of the Act). And so, the argument goes, this case is unlike Barnette or Wooley because the Board’s message is “non-ideological.” NLRB Br. 66. Even if we accepted the premise, the conclusion would not follow.
The right against compelled speech is not, and cannot be, restricted to ideological messages. Take for instance Riley v. National Federation of the Blind of North Carolina, Inc., 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). After recognizing that the First Amendment protects “the decision of both what to say and what not to say,” the Court cited Barnette and Wooley in holding that these and other cases “cannot be distinguished simply because they involved compelled statements of opinion while here we deal with compelled statements of ‘fact.’ ” Riley, 487 U.S. at 797, 108 S.Ct. 2667.[13] Yet *958 that distinction, rejected in Riley, is precisely the distinction the Board’s acting general counsel urges us to adopt.
Plaintiffs here, like those in other compelled-speech cases, object to the message the government has ordered them to publish on their premises. They see the poster as one-sided, as favoring unionization, because it “fails to notify employees, inter alia, of their rights to decertify a union, to refuse to pay dues to a union in a right-to-work state, and to object to payment of dues in excess of the amounts required for representational purposes.” Nat’l Ass’n of Mfrs. Br. 38; see also 76 Fed.Reg. at 54,022 (discussing comments).[14] The Board responds that it was entitled to make “editorial judgments” about what to put in and what to leave out, NLRB Br. 68, and that “if an employer is concerned that employees will get the wrong impression, it may legally express its opinion regarding unionization as long as it does so in a noncoercive manner,” 76 Fed.Reg. at 54,022.[15] Yet even in cases in which the message was other than one the government had devised, a “compelled-speech violation” occurred when “the complaining speaker’s own message was affected by the speech it was forced to accommodate.” Forum for Academic & Institutional Rights, 547 U.S. at 63, 126 S.Ct. 1297.
This brings us to what the Board considers its strongest precedent—UAW-Labor Employment & Training Corp. v. Chao, 325 F.3d 360 (D.C.Cir.2003). President Bush had issued an Executive Order requiring government contractors to post notices at their workplaces informing employees of their rights not to be forced to join a union or to pay union dues for nonrepresentational activities. Three unions and the UAW brought suit (the UAW was a government contractor). They argued that the National Labor Relations Act preempted the Executive Order. UAW-Labor, 325 F.3d at 362. This was then-only argument. They did not raise any “free-standing First Amendment claim.” Id. at 364. We therefore did not reach the question whether the posting requirement violated the contractors’ freedom of speech. As to § 8(c), the unions could not plausibly claim that the Executive Order violated this provision. The National Labor Relations Board was not in the picture. That is, there was no prospect of a contractor’s being charged with an unfair labor practice for failing to post the required notice.[16] As we put it, “the activities described in § 8(c) do not ‘constitute an unfair labor practice,’ except by negation, and are not ‘protected by’ the NLRA, except from the [Board] itself.” Id. at 365 (emphasis omitted).
We acknowledged in UAW-Labor that “the right to speak” includes “the right not to speak.” Id. And we assumed, in light of *959 the Supreme Court’s First Amendment decisions so holding, “that the § 8(c) right includes the right not to speak.” Id. But the § 8(c) right was only against the Board’s finding an unfair labor practice, or evidence thereof. Beyond that, “an employer’s right to silence is sharply constrained in the labor context, and leaves it subject to a variety of burdens to post notices of rights and risks.” Id.
In its preamble to the posting rule, the Board interpreted these passages to mean that under § 8(c) the Board may find that employers commit unfair labor practices if they fail to disseminate the Board’s message. See 76 Fed.Reg. at 54,-013. The Board’s interpretation of our opinion was mistaken.[17] In mentioning constraints on employer silence “in the labor context,” we were not referring to an employer’s protection against—as we put it—“the NLRA itself.” UAW-Labor, 325 F.3d at 365. We were making a different point: that apart from the § 8(c) bar against unfair-labor-practice charges, the National Labor Relations Act did not give employers an unconstrained right to silence. The Second Circuit said much the same in Healthcare Ass’n, 471 F.3d at 98-100, another preemption case.[18]
We return then to the question with which we began. Suppose that § 8(c) prevents the Board from charging an employer with an unfair labor practice for posting a notice advising employees of their right not to join a union. Of course § 8(c) clearly does this. How then can it be an unfair labor practice for an employer to refuse to post a government notice informing employees of their right to unionize (or to refuse to)? Like the freedom of speech guaranteed in the First Amendment, § 8(c) necessarily protects—as against the Board, see UAW-Labor, 325 F.3d at 365—the right of employers (and unions) not to speak. This is why, for example, a company official giving a non-coercive speech to employees describing the disadvantages of unionization does not commit an unfair labor practice if, in his speech, the official neglects to mention the advantages of having a union.
We therefore conclude that the Board’s rule violates § 8(c) because it makes an employer’s failure to post the Board’s notice an unfair labor practice, and because it treats such a failure as evidence of anti-union animus in cases involving, for example, unlawfully motivated firings or refusals to hire—in other words, because it treats such a failure as evidence of an unfair labor practice.[19] See Brown & *960 Root, Inc. v. NLRB, 333 F.3d 628, 637-39 & n. 7 (5th Cir.2003).
Ill
The Board’s third method of enforcing its rule is to toll the Act’s limitations period for filing unfair-labor-practice charges.[20] That time limit, added in 1947 as part of the TaftAHartley Act, is set forth in § 10(b) of the Act: “no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made, unless the person aggrieved thereby was prevented from filing such charge by reason of service in the armed forces, in which event the six-month period shall be computed from the day of his discharge.” 29 U.S.C. § 160(b).
The tolling provision differs from the two other enforcement methods we have discussed. It does not treat an employer’s failure to post the notice as an unfair labor practice, or as evidence of one. The district court nevertheless enjoined the Board from enforcing the provision. The court ruled that the provision “substantially amends the statute of limitations that Congress expressly set out in the statute” and therefore “exceeds [the Board’s] statutory authority under Chevron step one.”[21] Nat’l Ass’n of Mfrs., 846 F.Supp.2d at 58. We agree.
The Board characterized this portion of its rule as providing for “equitable tolling.” 76 Fed.Reg. at 54,033. The Supreme Court’s decision in Zipes v. Trans World Airlines, Inc., 455 U.S. 385,102 S.Ct. 1127, 71 L.Ed.2d 234 (1982), the Board said, “strongly supports” its tolling rule. Id. We do not see it that way. Zipes held that the statutory time limit for charges under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(e), was a statute of limitations, not a jurisdictional requirement. Zipes, 455 U.S. at 393, 102 S.Ct. 1127. Citing four cases from the courts of appeals, the Court analogized Title VII’s provision to § 10(b): “[T]he time requirement for filing an unfair labor practice charge under the National Labor Relations Act operates as a statute of limitations subject to recognized equitable doctrines and not as a restriction of the jurisdiction of the National Labor Relations Board, see NLRB v. Local 261, Laborers’ Int'l Union, 529 F.2d 778, 781-785 (CA8 1976); Shumate v. NLRB, 452 F.2d 717, 720 (CA4 1971); NLRB v. A.E. Nettleton Co., 241 F.2d 130, 133 (CA2 1957); NLRB v. Itasca Cotton Mfg. Co., 179 F.2d 504, 506-507 (CA5 1950)....” Id. at 395 n. 11, 102 S.Ct. 1127. These four circuit court decisions held only that § 10(b) was not jurisdictional; none of the cases dealt with any equitable doctrines.
To derive support from Zipes, the Board must have thought that its tolling rule fell within one of the “recognized equitable *961 doctrines.” Id. Yet the Board made no effort to demonstrate that when § 10(b) became law in 1947, Congress would have had any basis for assuming that the six-month limitations period might be modified by the sort of tolling rule the Board announced sixty-four years later. As we read the Supreme Court’s decisions dealing with tolling and other equitable modifications of statutes of limitations, that should have been the critical, consideration. See Gabelli v. SEC, — U.S. -, 133 S.Ct. 1216, 1220-24, 185 L.Ed.2d 297 (2013); Credit Suisse Sec. (USA) LLC v. Simmonds, — U.S. -, 132 S.Ct. 1414, 1419-21, 182 L.Ed.2d 446 (2012); John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 137-38, 128 S.Ct. 750, 169 L.Ed.2d 591 (2008); Young v. United States, 535 U.S. 43, 49-51, 122 S.Ct. 1036, 152 L.Ed.2d 79 (2002); TRW Inc. v. Andrews, 534 U.S. 19, 27-31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001); id. at 37-39, 122 S.Ct. 441 (Scalia, J., concurring); Rotella v. Wood, 528 U.S. 549, 555-61, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000); Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 363, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991); Irwin v. Dep’t of Veterans Affairs, 498 U.S. 89, 95-96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990); see also SM Co. v. Browner, 17 F.3d 1453, 1460-63 (D.C.Cir.1994); Adam Bain & Ugo Colella, Interpreting Federal Statutes of Limitations, 37 Creighton L. Rev. 493 (2004); John F. Manning, What Divides Textualists from Purposivists, 106 Colum. L. Rev. 70, 81-82 & n. 42 (2006).
We wrote in SM, in response to a federal agency’s argument for an “equitable” tolling exception to a statute of limitations, that we “are interpreting a statute, not creating some federal common law.” 17 F.3d at 1461. The key to interpreting a limitations statute and to determining the intent of Congress is whether the particular exception to a particular statute of limitations was generally recognized when Congress enacted the statute. See United States v. Kubrick, 444 U.S. 111, 119-20, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). It is not enough that courts engaged in some sort of “equitable tolling” at the time Congress passed the limitations statute. “[Different types of equitable tolling ... have been recognized at different times----” Bain & Colella, supra, 37 Creighton L. Rev. at 502. What matters is whether a particular basis for suspending the running of the statute of limitations had received judicial recognition when the statute became law. See Credit Suisse Sec., 132 S.Ct. at 1421. After all, “Congress cannot intend to incorporate, by silence, various forms of equitable tolling that were not generally-recognized in the common law at the time of enactment.” Bain & Colella, supra, 37 Creighton L. Rev. at 503.
Thus, if a particular exception was generally recognized when Congress enacted the statute of limitations, a court may presume that Congress intended the same equitable exception to apply to the statute. If, on the other hand, the exception was not generally recognized at that time, a court could not presume that Congress intended it to suspend the running of the statutory period. Cf. Meyer v. Holley, 537 U.S. 280, 286, 123 S.Ct. 824, 154 L.Ed.2d 753 (2003) (“Congress’[s] silence, while permitting an inference that' Congress intended to apply ordinary background tort principles, cannot show that it intended to apply an unusual modification of those rules.”).
Rather than following these legal principles, the Board relied on an analogy to the long-established equitable doctrine of fraudulent concealment.[22] See 76 Fed. *962 Reg. at 54,033. This doctrine, which the Board has applied to toll the § 10(b) limitations period,[23] has three elements: “fraudulent concealment tolls a statute of limitations when (1) there has been ‘deliberate concealment’ of (2) ‘material facts’ relating to the alleged wrongdoing and (3) the wronged party does not know of those facts and could not have discovered them through ‘reasonable diligence.’ ” Int’l Ass’n of Machinists & Aerospace Workers v. NLRB, 130 F.3d 1083, 1087 (D.C.Cir.1997) (quoting Fitzgerald v. Seamans, 553 F.2d 220, 228 (D.C.Cir.1977)); see also Local Lodge No. 1424 v. NLRB, 362 U.S. 411, 429 & n. 19, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960). The Board, using what it termed its “intuitive sense,” determined that even if the employee knew all the facts, in which event the fraudulent-concealment doctrine would not apply, the § 10(b) period could be suspended if the employee lacked knowledge of the law. 76 Fed. Reg. at 54,033.
As Justice Scalia put it in a concurring opinion, this is “bad wine of recent vintage.” TRW, 534 U.S. at 37, 122 S.Ct. 441. The Board neglected to tie its theory to anything the 1947 Congress might have intended, and it contradicted the Supreme Court’s ruling in Kubrick, 444 U.S. 111, 100 S.Ct. 352. Kubrick argued that the limitations period in the Federal Tort Claims Act (28 U.S.C. § 2401(b)) should not begin running until he not only became aware of his injury but .also learned of the law giving him a cause of action. In rejecting this argument, the Court refused to treat “a plaintiffs ignorance of his legal rights” as if it were the same as “his ignorance of the fact of his injury,” Kubrick, 444 U.S. at 122, 100 S.Ct. 352, a point we relied upon in 3M, 17 F.3d at 1461 n. 14, when we rejected a similar argument.
The Board also cited a dozen or so circuit court and district court cases holding that an employer’s failure to post notices required by Title VII of the Civil Rights Act and by the Age Discrimination in Employment Act (ADEA) warranted tolling. See 76 Fed.Reg. at 54,033-34. We take no position on whether those cases were correctly decided in light of the line of Supreme Court decisions mentioned earlier.[24] Whatever their validity, the two earliest cases the Board cited were decided in 1977 and 1978, more than thirty years after Congress enacted § 10(b). And in one of those—Kephart v. Inst. of Gas Tech., 581 F.2d 1287, 1289 (7th Cir.1978)—the court rested its tolling decision on the intent of Congress as reflected in a Conference Committee report.[25]
The short of the matter is that the Board has not invoked any authority suggesting that the 1947 Congress intended to allow § 10(b) to be modified in the manner of the Board’s tolling rule. Whether one frames the Board’s tolling rule as resting on the employer’s failure to post the Board’s notice or on the charging employ *963 ee’s lack of knowledge of his rights under the National Labor- Relations Act, the Board marshaled nothing to show that by 1947 this was a generally accepted basis for tolling limitations periods. We have already mentioned the Supreme Court’s 1979 decision in Kubrick, which seems to us at odds with the Board’s approach. It is also noteworthy that a comprehensive— and widely cited—survey of the law of statutes of limitations, published only three years after enactment of the Tafh-Hartley Act, contains no mention of any equitable doctrine comparable to the one reflected in the Board’s rule. See Developments in the Law: Statutes of Limitations, 63 Harv. L. Rev. 1177 (1950).[26] Even today courts do not generally recognize lack of knowledge of the law as a basis for equitable tolling. Some of the more recent cases from the circuits, dealing with a wide variety of statutes, are set forth in the margin.[27] As the Tenth Circuit stated in a case dealing with the limitations period in the Railroad Retirement Act, 45 U.S.C. § 231h, “we are aware of no authority ... which suggests that ignorance of the law should warrant equitable tolling of a statute of limitations.” Gatewood v. R.R. Retirement Bd., 88 F.3d 886, 890 (10th Cir.1996).
We therefore hold that the Board’s tolling rule is contrary to § 10(b).
IV
Because all three of the means for enforcing the Board’s posting requirement are invalid, we do not decide whether, as plaintiffs also contend, the Board lacked the regulatory authority to issue subpart A of its rule—the requirement that employers post the notice specified in the appendix to that subpart. Subpart A clearly is not severable. See MD/DC/DE Broadcasters Ass’n v. FCC, 236 F.3d 13, 22-23 (D.C.Cir.2001). “Severance and affirmance of a portion of an administrative regulation is improper if there is ‘substantial doubt’ that the agency would have adopted the severed portion on its own.” Davis Cnty. Solid Waste Mgmt. v. EPA, 108 F.3d 1454, 1459 (D.C.Cir.1997) (per curiam) (quoting North Carolina v. FERC, 730 F.2d 790, 795-96 (D.C.Cir.1984) (Sealia, J.)). If a reviewing court severed the regulation in that situation, it would be performing a function left to the agency. See Fed. Power Comm’n v. Idaho Power Co., 344 U.S. 17, 20-21, 73 S.Ct. 85, 97 L.Ed. 15 (1952); cf. Zuber v. Allen, 402 F.2d 660, 674 (D.C.Cir.1968).[28] Here we *964 know that the Board would not have issued a posting rule that depended solely on voluntary compliance. We know this because the Board rejected that regulatory option in the preamble to its final rule. See 76 Fed.Reg. at 54,031. Subpart A must therefore fall along with the rest of the Board’s posting rule.
V
For the reasons stated, the Board’s posting rule is vacated.

Affirmed in part and reversed in part.

ADDENDUM
Appendix to Subpart A—Text of Employee Notice
“EMPLOYEE RIGHTS UNDER THE NATIONAL LABOR RELATIONS ACT
The National Labor Relations Act (NLRA) guarantees the right of employees to organize and bargain collectively with their employers, and to engage in other protected concerted activity or to refrain from engaging in any of the above activity. Employees covered by the NLRA* are protected from certain types of employer and union misconduct. This Notice gives you general information about your rights, and about the obligations of employers and unions under the NLRA. Contact the National Labor Relations Board (NLRB), the Federal agency that investigates and resolves complaints under the NLRA, using the contact information supplied below, if you have any questions about specific rights that may apply in your particular workplace.
“Under the NLRA, you have the right to:
• Organize a union to negotiate with your employer concerning your wages, hours, and other terms and conditions of employment.
• Form, join or assist a union.
• Bargain collectively through representatives of employees’ own choosing for a contract with your employer setting your wages, benefits, hours, and other working conditions.
• Discuss your wages and benefits and other terms and conditions of employment or union organizing with your coworkers or a union.
• Take action with one or more co-workers to improve your working conditions by, among other means, raising work-related complaints directly with your employer or with a government agency, and seeking help from a union.
• Strike and picket, depending on the purpose or means of the strike or the picketing.
• Choose not to do any of these activities, including joining or remaining a member of a union.
“Under the NLRA, it is illegal for your employer to:
• Prohibit you from talking about or soliciting for a union during non-work time, such as before or after work or during break times; or from distributing union literature during non-work time, in non-work areas, such as parking lots or break rooms.
• Question you about your union support or activities in a manner that discourages you from engaging in that activity.
• Fire, demote, or transfer you, or reduce your hours or change your shift, or otherwise take adverse action against you, or threaten to take any of these actions, because you join or support a union, or because you engage in concerted activity for mutual aid and protection, or because you choose not to engage in any such activity.
*965 • Threaten to close your workplace if workers choose a union to represent them.
• Promise or grant promotions, pay raises, or other benefits to discourage or encourage union support.
• Prohibit you from wearing union hats, buttons, t-shirts, and pins in the workplace except under special circumstances.
• Spy on or videotape peaceful union activities and gatherings or pretend to do so.
“Under the NLRA, it is illegal for a union or for the union that represents you in bargaining with your employer to:
• Threaten or coerce you in order to gain your support for the union.
• Refuse to process a grievance because you have criticized union officials or because you are not a member of the union.
• Use or maintain discriminatory standards or procedures in making job referrals from a hiring hall.
• Cause or attempt to cause an employer to discriminate against you because of your union-related activity.
• Take adverse action against you because you have not joined or do not support the union.
“If you and your co-workers select a union to act as your collective bargaining representative, your employer and the union are required to bargain in good faith in a genuine effort to reach a written, binding agreement setting your terms and conditions of employment. The union is required to fairly represent you in bargaining and enforcing the agreement.
“Illegal conduct will not be permitted. If you believe your rights or the rights of others have been violated, you should contact the NLRB promptly to protect your rights, generally within six months of the unlawful activity. You may inquire about possible violations without your employer or anyone else being informed of the inquiry. Charges may be filed by any person and need not be filed by the employee directly affected by the violation. The NLRB may order an employer to rehire a worker fired in violation of the law and to pay lost wages and benefits, and may order an employer or union to cease violating the law. Employees should seek assistance from the nearest regional NLRB office, which can be found on the Agency’s Web site: http://www.nlrb.gov.
You can also contact the NLRB by calling toll-free: 1-866-667-NLRB (6572) or (TTY) 1-866-315-NLRB (1-866-315-6572) for hearing impaired.
If you do not speak or understand English well, you may obtain a translation of this notice from the NLRB’s Web site or by calling the toll-free numbers listed above.
“ *The National Labor Relations Act covers most private-sector employers. Excluded from coverage under the NLRA are public-sector employees, agricultural and domestic workers, independent contractors, workers employed by a parent or spouse, employees of air and rail carriers covered by the Railway Labor Act, and supervisors (although supervisors that have been discriminated against for refusing to violate the NLRA may be covered).
“This is an official Government Notice and must not be defaced by anyone.”
29 C.F.R. pt. 104, subpt. A, app.

. The final rule states that if the law developed by the courts or the Board changes, the Board may—by “rules, regulations, or orders”—alter the poster's content. 29 C.F.R. § 104.202(c).

. The Bureau of Labor Statistics reported that unions represented 7.3 percent of private-sector employees in 2012. Press Release, Bureau of Labor Statistics, Union Members-2012 (table 3) (Jan. 23, 2013), available at http ://www.bls. gov/news.release/pdf7union2. pdf.

. On April 17, 2012, a panel of this court granted plaintiffs' motion for a stay of the rule pending these appeals. See Nat’l Ass’n of Mfrs. v. NLRB, No. 12-5068, 2012 WL 4328371 (D.C.Cir. Apr. 17, 2012) (unpublished order).

. Wilma Liebman had been confirmed on November 8, 1997, for the remainder of the term that expired on December 16, 1997, and for a term that expired on December 16, 2002, see 143 Cong. Rec. S12,214 (daily ed. Nov. 8, 1997), and on November 14, 2002, for a term that expired on August 27, 2006, see 148 Cong. Rec. SI 1,031 (daily ed. Nov. 14, 2002).

. Receipt of the document by the Office does not constitute "filing.'' Rather, a document is filed for public inspection "only after it has been received, processed and assigned a publication date.” 1 C.F.R. § 17.2(a).

. Documents are also posted to the Office's website. See Electronic Public Inspection Desk, Office of the Federal Register, http:// www.ofr.gov/inspection.aspx.

. Even within the Federal Register Act, the term "promulgated” seems to have different meanings in different contexts. Compare 44 U.S.C. § 1503 ("When the original [document required or authorized to be published] is issued, prescribed, or promulgated outside the District of Columbia, and certified copies are filed before the filing of the original, the notation shall be of the day and hour of filing of the certified copies.”), and id. ("Every Federal agency shall cause to be transmitted for filing the original and the duplicate originals or certified copies of all such documents issued, prescribed, or promulgated by the agency.”), with id. § 1505(c) ("In the event of an attack or threatened attack upon the continental United States and a ... [suspension of] all or part of the requirements of law or regulation for filing with the Office or publication in the Federal Register of documents or classes of documents[,] ... [t]he President shall establish alternate systems for promulgating, filing, or publishing documents or classes of documents affected by such suspensions. ...”).

. Whether § 8(c) is broader than the First Amendment—in, for example, prohibiting the Board from using noncoercive employer speech as evidence bearing on an unfair labor practice, see Archibald Cox, Some Aspects of the Labor Management Relations Act, 1947, 61 Harv. L. Rev. 1, 19 (1947)—is an issue we need not decide. Nor do we need to consider whether § 8(c) is narrower than the First Amendment in some respects. See Richard A. Epstein, The Case Against the Free Choice Act 26-27 (John M. Olin Law & Economics Working Paper No. 452 (2d series), 2009) (noting that § 8(c)’s final phrase—permitting speech only if it "contains no threat of reprisal or force or promise of benefit”—"has no analogy anywhere else in First Amendment law”). We also think it unimportant to this case that § 8(c) might be seen as a content-based regulation of labor speech, a matter of consequence in some First Amendment cases. See Sorrell v. IMS Health Inc., — U.S. -, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011); Police Dep’t v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). The parties have raised none of the issues these subjects would pose.

. The district court decided that § 104.214(b), the "anti-union animus” provision, was valid, even though the court thought plaintiffs had not "specifically” challenged the provision and had not made "an argument as to why that provision is invalid.” Nat’l Ass’n of Mfrs., 846 F.Supp.2d at 63 & n. 26. But plaintiffs, in a supplemental statement filed before the court’s ruling, insisted that their amended complaint challenged the validity of the entire rule. And plaintiffs’ memorandum in support of their motion for summary judgment expressly argued not only that § 8(c) barred the Board from finding that an employer's failure to post was an unfair labor practice, but also that the Board could not treat a failure to post as "proof of anti-union animus” on the part of an employer. Plaintiffs have sufficiently preserved the same argument in their brief and reply brief in this court.

. We agree with the district court, Nat’l Ass'n of Mfrs., 846 F.Supp.2d at 52 n. 15, that although § 104.210 states that the Board "may” find an employer's willful noncompliance to be an unfair labor practice, it is clear from § 104.213 and the preamble to the rule that "may” means "will.” The Board has not argued otherwise.

. As examples of such unfair labor practices, the Board mentioned plant-closing threats, firings or refusals to hire, and interrogations of employees. See 76 Fed.Reg. at 54,035-36 (citing cases); see also Cox, supra, 61 Harv. L. Rev. at 19.

. The Board did not explain how it expected to enforce this warning.

. In addition to Barnette and Wooley, the Court cited Pacific Gas, 475 U.S. 1, 106 S.Ct. 903 (plurality opinion), and Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). The Supreme Court has thus recognized that its “compelled-speech cases” apply to situations "in which an individual must personally speak the government’s message,” as well as *958 those in which one must "host or accommodate another speaker’s message.” Forum for Academic & Institutional Rights, 547 U.S. at 63, 126 S.Ct. 1297; see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, 515 U.S. 557, 573-74, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995).

. The Board seemed to accept plaintiffs' contention that its poster must be even-handed. See NLRB Br. 68-69; 76 Fed.Reg. at 54,022.

. Although the poster identifies the Board as its author, it does not state that the employer had no choice but to display it. We suppose an employer could post a statement next to the poster pointing out its compulsory nature. Cf. PruneYard Shopping Ctr. v. Robins, 447 U.S. 74, 87, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980).

.The Board held in Rochester Manufacturing Co., 323 N.L.R.B. 260, 262 (1997), that employers do not commit unfair labor practices if they fail to inform their employees of their rights not to be forced to join a union or to pay union dues for non-representational activities. See UAW-Labor, 325 F.3d at 363.

. While an agency’s interpretation of its own precedent may be entitled to deference, see Ceridian Corp. v. NLRB, 435 F.3d 352, 355 (D.C.Cir.2006), we owe no deference to an agency’s interpretation of judicial precedent, see New York New York, LLC v. NLRB, 313 F.3d 585, 590 (D.C.Cir.2002).

. In a footnote to its brief, the Board states , that its rule satisfies Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio, 471 U.S. 626, 651, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985), but it does not explain why that decision has even the slightest bearing on this case. Under Zauderer, the government may, consistently with the First Amendment, require a party to a commercial transaction to make disclosures in order to prevent that party from deceiving its customers. See R.J. Reynolds, 696 F.3d at 1215. (The Board essentially followed the same reasoning in requiring unions to inform nonunion employees of their right to limit the amount of dues and fees they pay to the unions under union-shop agreements. See Rochester Mfg. Co., 323 N.L.R.B. 260 (1997); California Saw & Knife Works, 320 N.L.R.B. 224 (1995).) But that has nothing to do with this case. As we s,aid earlier, no one—and certainly not the Board—has even suggested that the posting rule was needed because employers are misleading employees about their rights under the National Labor Relations Act.

.Our conclusion here does not affect the Board’s rule requiring employers to post an election notice (which similarly contains in *960 formation about employee rights) before a representation election, 29 C.F.R. § 103.20. Because the failure to post the required election notice does not constitute an unfair labor practice but may be a basis for setting aside the election, see id. § 103.20(d), the rule does not implicate § 8(c).

. The rule provides, in relevant part:
When an employee files an unfair labor practice charge, the Board may find it appropriate to excuse the employee from the requirement that charges be filed within six months after the occurrence of the allegedly unlawful conduct if the employer has failed to post the required employee notice unless the employee has received actual or constructive notice that the conduct complained of is unlawful.
29 C.F.R. § 104.214(a).

. Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

. See, e.g., Holmberg v. Armbrecht, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946); Bailey v. Glover, 88 U.S. (21 Wall.) 342, 22 L.Ed. 636 (1874).

. See, e.g., Don Burgess Constr. Corp., 227 N.L.R.B. 765 (1977), enforced, 596 F.2d 378 (9th Cir.1979).

. As the district court in this case stated, there appears to be a split in the circuits on the question whether failure to post under Title VII or the ADEA warrants tolling of the limitations period. See Nat’l Ass'n of Mfrs., 846 F.Supp.2d at 57 n. 20.

. Kephart, 581 F.2d at 1289, and several of the other cases the Board relied upon described tolling for failure to post a notice required by statute as a "penalty.” See Posey v. Skyline Corp., 702 F.2d 102, 104-05 (7th Cir.1983); Bonham v. Dresser Indus., Inc., 569 F.2d 187, 193 (3d Cir.1977). The Board concedes that its authority is remedial only and that it may not exact penalties. See 76 Fed.Reg. at 54,031, 54,037. The Supreme Court has so held. See Wis. Dep’t of Indus., Labor & Human Relations v. Gould, Inc., 475 U.S. 282, 288 n. 5, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986).

. Before the Harvard Law Review study in 1950, the only comprehensive study of statutes of limitations in America was "the fourth edition of Wood’s Limitations in 1916." 63 Harv. L. Rev. at 1177 (referring to H.G. Wood, A Treatise on the Limitation of Actions at Law and in Equity (Matthew Bender & Co. 4th ed.1916)). This treatise makes clear that there was no recognized equitable doctrine permitting the tolling of a statute of limitations on the ground that the injured party did not know the law. See 2 Wood, supra, § 276c(l), at 1408-11.

. See, e.g., Josselyn v. Dennehy, 475 F.3d 1, 5 (1st Cir.2007); Ormiston v. Nelson, 117 F.3d 69, 72 n. 5 (2d Cir.1997); United States v. Sosa, 364 F.3d 507, 512 (4th Cir.2004); Fierro v. Cockrell, 294 F.3d 674, 683 (5th Cir.2002); Graham-Humphreys v. Memphis Brooks Museum of Art, Inc., 209 F.3d 552, 561-62 (6th Cir.2000); Arrieta v. Battaglia, 461 F.3d 861, 867 (7th Cir.2006); Frisby v. Milbank Mfg. Co., 688 F.3d 540, 544 (8th Cir.2012) (Arkansas law); Luna v. Holder, 659 F.3d 753, 760 (9th Cir.2011); United States v. Denny, 694 F.3d 1185, 1191 (10th Cir.2012); Jackson v. Astrue, 506 F.3d 1349, 1356 (11th Cir.2007); United States v. Pollard, 416 F.3d 48, 55 (D.C.Cir.2005); Shoshone Indian Tribe of the Wind River Reservation v. United States, 672 F.3d 1021, 1032 (Fed.Cir.2012).

.Unlike in cases such as Zuber and MD/DC/DE Broadcasters Ass’n, in this case the Board did not include a severability clause in its rule and it did not include a statement on severability in its preamble to the final rule.